# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIDIA MATA HERNANDEZ, | CASE NO. 1:11-CV-01840-SMS |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |
| CAROLYN W.COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Lidia M. Hernandez, by her attorney, Lars A. Christenson, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1] Following a review of the complete record and applicable law, this Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards. Accordingly, this Court affirms the Commissioner's determination.

---

[1] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 10 & 11).

I. **Procedural History**

On August 26, 2008, Plaintiff applied for SSI income, alleging disability beginning April 10, 2008. Her claim was denied initially on November 6, 2008. It was denied upon reconsideration on March 13, 2009. Plaintiff requested a hearing on April 10, 2009. The hearing occurred on August 13, 2010 before ALJ Regina L. Sleater. Plaintiff appeared and testified. Also testifying were Harvey L. Alpern, M.D., an impartial medical expert, and Jose L. Chaparro, an impartial vocational expert ("VE").

On November 19, 2010, the ALJ denied Plaintiff's application. The Appeals Council denied review on September 22, 2011. Plaintiff filed a complaint seeking this Court's review on November 3, 2011. Doc. 1.

II. **Factual Record**

A. **Background**

At the time of the hearing, Plaintiff was 47 years old (born September 13, 1963) with a tenth grade education and past relevant work experience as an agricultural product packer, a fruit harvest worker and a machine packer. She lived with her mother and brother in Strathmore, California. She told the ALJ that she had used methamphetamine for ten years and also used marijuana. (She told her neurologist that she used both drugs for twenty years. AR 334.) After finishing a two-month drug related jail term in April 2008, she lived in a recovery home for four months through August 2008. She states that she has not used drugs since October 2008. AR 52.

Plaintiff said she was disabled by reason of three strokes, right side weakness, and swelling in her right arm. Her disability began on April 10, 2008, when she was a prisoner at the Bob Wiley Detention Facility in Visalia, California. She believes that on that date she had a stroke. She blacked out, without hitting her head, and woke up in the infirmary, with her face turning to the side. She was discharged from the infirmary the same night. Several days later she noticed numbness and weakness in her right side which continues to this day.

/ / /

/ / /

B. **Medical Record**

On March 9, 2008, Plaintiff was taken from the jail to the Emergency Department of Kaweah Delta Health Care Center for a sharp chest pain with nausea. She also had swelling in her upper right arm. Within several hours the pain had gone away. Several diagnostics were performed: a chest x-ray and CT scan, an ECG, lab tests, and ultrasound of the right upper extremity veins. All were normal. The arm swelling was found not to be thrombotic. She was discharged on the same date. The record noted that she had been non-compliant with medications since a previous visit.

April 10, 2008 is when Plaintiff believes she had a stroke. There are no medical records from this time. After finishing her jail sentence, Plaintiff visited the Hillman Family Practice on April 29, 2008, complaining of a sore throat and possible ear infection. She claimed to have had a possible stroke while in jail. AR 227. (This was Plaintiff's first visit to the Hillman practice. At each visit, her progress notes would be written by her treating physician, Truc Nguyen, M.D., or occasionally by Christina Erwin, N.P.)

On May 27, 2008 she returned to Hillman. The doctor's impression was hypertension and headaches. He suggested sleep apnea as the suggested source of her headaches. He recommended Ibuprofen and suggested she get a sleep apnea study.

On June 9, 2008, Plaintiff returned to the Kaweah Care Center, complaining of intermittent right-sided headaches for the past three weeks. A head CT scan was normal. The diagnosis was tension headaches. The doctor recommended Tylenol or Ibuprofen for her pain.

On August 15, 2008, a head CT scan again was normal.

On August 19, 2008, she met with an eye doctor at Eye Surgical and Medical Associates, Inc. She complained of right-sided weakness and a sharp pain behind her head when looking right or left. The doctor referred her for a brain MRI.

On September 2, 2008, the brain MRI showed a small old lacunar infarct in the basal ganglia on the right side. The study also showed mild chronic ischemic changes of white matter due to small vessel disease, as well as sinusitis.

1          On September 9, 2008, Plaintiff again saw the eye doctor from Eye Surgical. She
2   complained of right-side weakness and headaches and tingling on the right side of her head. The
3   doctor noted the MRI results and suggested she be observed.
4          On September 24, 2008 and again on October 8, 2008, Plaintiff sought treatment at the
5   Hillman Health Clinic for right side pain and weakness. Dr. Nguyen suggested she see a
6   neurologist.
7          On November 6, 2008, Plaintiff began seeing neurologist Ramu Thiagarajan, M.D. The
8   notes from this initial visit do not appear in the record. However, according to a progress note
9   from Hillman dated November 7, 2008, Plaintiff stated that she saw the neurologist the day
10  before and was told that the cause of her facial numbness was anxiety attacks. AR 225.
11  According to this note from Hillman on November 7, 2008, Plaintiff described numbness on the
12  right side of her face. Progress notes from January and February 2009 show that Plaintiff
13  presented with complaints of pain in her right arm and leg and in the right side of her neck, as
14  well as sleeping problems.
15         On November 4, 2008 and on March 13, 2009, the state agency medical consultants
16  reviewed Plaintiff's medical records and concluded she had no severe impairments. (See
17  discussion of consultants below.)
18         In March 23, 2009, Dr. Nguyen ordered a cervical spine x-ray due to the pain in
19  Plaintiff's right shoulder and neck. The x-ray showed some degenerative spurring, as well as disk
20  space and neural foraminal narrowing. The right shoulder x-ray test performed on the same date
21  was normal.
22         A brain MRI study dated June 1, 2009 (also ordered by Dr. Nguyen) demonstrated
23  essentially the same results as the September 2008 MRI study–scattered, nonspecific deep white
24  matter lesions, of unknown significance, and chronic small lacunar infarct.
25         On July 7, 2009, Plaintiff again saw Dr. Thiagarajan. (This was either her second or third
26  of her seven visits with her neurologist, but only the first that is documented in the record.)
27         On August 15, Plaintiff's head CT scan showed no remarkable findings.
28         On August 21, 2009, Dr. Thiagarajan concluded that Plaintiff's MRI did not explain the

symptoms that were purportedly associated with Plaintiff's cerebrovascular accident. Regarding her paresthesia, he reserved judgement and referred her to a cerebrospinal fluid (CSF) analysis. AR 339-41.

On September 2, 2008, Plaintiff had another brain MRI. AR 296-97. At the hearing, the medical expert discussed this MRI and explained that it was not indicative of a major stroke, but could be consistent with MS, generalized arteriosclerosis, or some other condition. (AR 47; see discussion of expert below.)

On September 11, 2009, Dr. Thiagarajan conducted the CSF analysis. His records for September 22, 2009 show that the CSF was negative for multiple sclerosis. There was still no explanation for the persistent paresthesia. He referred her to needle electromyography (EMG) and nerve conduction studies (NCS) to explain her alleged persistent loss of sensation.

On October 28, 2009, the EMG and NCS showed mild carpal tunnel syndrome in both hands without any axonal loss, and mild ulnar neuropathy at the left elbow. Other studies were normal in both right and upper and lower extremities. The needle EMG findings were normal.

Progress reports from Hillman Clinic show that Plaintiff continued complaining of right-sided numbness, pain, or swelling in November 26, 2008, December 4, 2008, January 7, 2009, January 15, 2009, and February 4, 2009.

A year later, on March 2, 2010, Plaintiff saw Dr. Thiagarajan for pain in her right arm. The doctor ordered a venous ultrasound to rule out deep vein thrombosis. Dr. Thiagarajan's records end here.

### C. RFC Questionnaires of Dr. Thiagarajan and Dr. Nguyen

**Dr. Thiagarajan**. On February 26, 2010, Dr. Thiagarajan completed an RFC questionnaire for Plaintiff and provided the following information. Her diagnoses were paresthesias (numbness) and syncope (fainting). Her symptoms were dizziness, fatigue, and pain and paresthesias (generalized, on her right side). He based his assessment of her impairments on the MRI, which showed scattered white matter changes suspicious for demyelination, and her CSF analysis, which was negative for multiple sclerosis. The drugs she took were minimally effective: these were tramadol, amitriptyline, and neurontin. The drugs caused side effects of dizziness and

drowsiness. Her impairments lasted or could last twelve months.

Emotional factors did not contribute to her symptoms or limitations, and she was not a malingerer. Her impairments were reasonably consistent with her symptoms and functional limitations, which Dr. Thiagarajan characterized as follows:

- Plaintiff's pain and other symptoms were frequently severe enough to interfere with the attention and concentration needed to perform simple work tasks.
- She could maintain attention for less than two hours at a time.
- She was capable of low-stress jobs; the doctor attributed this limitation to her pain, paresthesias, and dizziness.
- She could sit for two hours total in a workday and stand and walk for less than two hours total. She would need a job which permits shifting positions at will, as well as unscheduled breaks every two hours lasting fifteen to twenty minutes.
- She was limited to lifting and carrying less than ten pounds rarely and should never perform postural activities. Flexing her neck or holding it static could be done only rarely.
- She had significant limitations in repetitive reaching, handling, or fingering bilaterally, right side more than left.
- She was likely to miss four days a month due to the impairment.

**Dr. Nguyen**. On August 31, 2008, after the hearing but before the decision was issued, Dr. Nguyen (Plaintiff's treating physician at Hillman Clinic) also completed the same RFC questionnaire. Diagnoses were stroke, lacunar infarctions including thalamic infarctions, hypertension, thrombosis of the jugular vein (2008), arthritis, carpal tunnel syndrome, and ulnar neuropathy.

Emotional factors did contribute to her symptoms or limitations, as did anxiety and poor sleep patterns. She was not a malingerer. Her impairments were reasonably consistent with her symptoms and functional limitations, which Dr. Nguyen characterized as follows:

- Plaintiff's pain and other symptoms were frequently severe enough to interfere with the attention and concentration needed to perform simple work tasks.
- She could maintain attention for a half hour at a time.
- She was not capable of tolerating any stress at work; the doctor attributed this limitation to her pain, numbness, and frequent dizziness.
- She could sit for two hours total in a workday and stand and walk for less than two hours total. She would need a job which permits periods of walking every thirty minutes for five minutes each time. She would need a job which permits shifting positions at will, as well as unscheduled breaks every hour lasting fifteen to twenty minutes.
- She was limited to lifting and carrying less than ten pounds rarely and should never perform postural activities. Flexing her neck or holding it static could be done only rarely.
- She had significant limitations in repetitive reaching, handling, or fingering bilaterally. This affected the right and left sides equally.
- She was likely to miss four days a month due to the impairment.

///

**D.     Review By State Agency Medical Consultants**

On November 4, 2008, state agency medical consultant W. Jackson, M.D., reviewed Plaintiff's records and concluded she had no severe impairments. AR 204-5. Her hypertension was not severe; he noted that she had no end organ damage. Her headaches were also not severe in themselves. He did not believe that she actually had a stroke in April 2008, noting that there had never been a definitive diagnosis. Her most recent ER visits confirmed no current deep vein thrombosis or blood clot. He did not credit Plaintiff's claims that she was unable to use the right side of her body. Her history of methamphetamine use was a factor against her credibility.

On March 13, 2009, state agency medical consultant C. Lopez, M.D., concluded that there had not been a change of circumstances between November 2008 (the date of Dr. Jackson's review) through the present. He noted new records from Dr. Nguyen in which Plaintiff complained of right-side pain and numbness, but he agreed with Dr. Jackson that these symptoms were not likely caused by a stroke and that Plaintiff had no severe impairment.

**E.     Opinion of Impartial Medical Expert Harvey L. Alpern, M.D.**

At the hearing, the ALJ heard from Harvey L. Alpern, M.D., an impartial, non-examining medical expert, who is board certified in Internal Medicine and Cardiovascular Disease. Based on his review of Plaintiff's records, he testified that, even assuming that she was experiencing paresthesia on her right side, he did not agree with the diagnosis of cerebral vascular disease with stroke. The record lacked sufficient objective testing to support that conclusion, such as a full neurological study or a study of the vascular system to rule out other diagnoses. Also, the neurologist accepted Plaintiff's description that the numbness was on the right side, without specifying in a sensory examination where the boundary is. Paresthesia can be caused by "almost a thousand different things," and given that Plaintiff described it as affecting the entire right side of her body, the expert wanted to see more careful neurologic descriptions of that side of her body. (In addition, Dr. Thiagarajan's medical records were formatted in a way that made it hard to be "sure what he's actually done.")

The expert also opined that stroke was not indicated by the brain MRI of September 2, 2008 (AR 297-98). The MRI did not show a cerebral vascular accident large enough to cause

hemiplegia (one-sided paralysis) or hemiparesthesia (one-sided numbness). Instead, the MRI was consistent with several different conclusions, including tiny vessel stroke, severe hypertension (which Plaintiff did not have–her hypertension was well controlled with medications and had not caused any end organ damage), diabetes, arteriosclerosis, multiple sclerosis, or some other cause. The neurologist seemed to have diagnosed stroke after excluding multiple sclerosis by means of a lumbar puncture. But the expert believed that MS had not yet been ruled out. AR 46. Generalized arteriosclerosis could also not be ruled out until a vascular study had been done. AR 47.

Also weighing against a stroke diagnosis, the expert found no evidence of loss of muscle strength or atrophy; he questioned why the treating doctors stated that she could not lift with her right side. The expert also noted that there was a period after Plaintiff's alleged stroke when Dr. Nguyen's records show complaints of hypertension but not of pain or numbness in the right side.

### F. Additional Evidence As To Plaintiff's Functional Abilities

#### 1. Plaintiff's Testimony As To Functional Limitations

At the hearing, Plaintiff testified that she lived with her mother and brother. To shop for groceries, she would go with her mother. Sometimes she could not finish because it would be too much walking and her leg would start dragging more. Her brother would bring the groceries into the house.

She could only sweep her house for "a couple minutes," or "halfway down my hallway" (which she described as the length of the hearing room). Then she would lose control of the broom, her legs would start dragging worse, and she would have to sit down. AR 50. She could only sit for fifteen minutes at a time because of pain in her right hip. This pain started when she blacked out in April 2008. AR 50. She could only stand for fifteen minutes at a time before her right leg would get weak. In an eight-hour day she would typically have to lay down twice, at random times, for half an hour. Due to pain in her right side, she would wake up two or three times in the night. She could lift a gallon of milk, unless she lost her grip on it. Sometimes she would need her mom to help her with grooming because of pain and weakness on her right side. She would have bad days two or three times a week. On these days there would be more pain and numbness in her right leg and right side than usual, preventing her from getting out of bed almost

entirely.

### 2. Opinion of Dr. Alpern As To Functional Limitations

Dr. Alpern testified that Plaintiff could lift 20 pounds occasionally and ten pounds frequently. She could stand, sit, and walk six out of eight hours. She would have "some problems" in frequent, repetitive actions on her right side, which would be a limitation but not a complete limitation on her right side. She could stand and walk for six hours. She could use the upper right extremity for all functions, with only occasional grasping and gripping. She could occasionally engage in postural activities. (These are activities involving changes in posture, such as stooping, kneeling, crouching, and crawling. *See* SSR 85-15; SSR 96-9p.)

### G. Testimony of Vocational Expert

Jose L. Chaparro testified as the VE. He characterized Plaintiff's past work as agricultural product packer (medium, 2), fruit harvest worker (medium, 2) and machine packer (medium, 2). The ALJ asked him to assume a person of Plaintiff's age (born in 1963, a "younger individual"), education (limited, and able to communicate in English), and work background (unskilled). The person could frequently lift ten pounds and occasionally lift 20 pounds, and could stand and walk six out of eight hours and sit six out of eight hours. The person also had these limitations: her ability to push and pull on the right side was limited to frequent repetitive actions; she could perform all postural activities only occasionally; and she could reach and handle with her right upper extremity only occasionally.

According to the VE, this person could not perform Plaintiff's past relevant work. However, this person could perform other jobs. The representative titles included children's attendant (2,400 jobs in California, 16,500 nationwide), usher (2,200 jobs in California and 16,500 nationwide), and dealer accounts investigator (1,300 jobs in California and 8,400 nationwide).

/ / /

/ / /

### III. **The ALJ's Decision.**

The ALJ followed the five-step sequential process prescribed by the Commissioner for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). This process entailed answering the following five questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 26, 2008.

At Step Two, the ALJ accepted that Plaintiff had medically determinable impairments (hypertension and right side weakness/numbness). However, he did not credit their alleged intensity, persistence or limiting effects. He found they were not severe, and Plaintiff not disabled.

In the alternative, if they were severe (Step Two), they were nevertheless not disabling (Step Three) and caused only modest limitations (RFC). She could do light work with limitations of sitting six of eight hours, frequent right-side pushing and pulling, occasional postural activities, and occasional right arm reaching and handling. ("Occasionally" means from very little to one-third of the time; "frequently" means from one-third to two-thirds of the time. SSR 83-10.)

At Step Four, she could not perform relevant past work. At Step Five, her vocational profile was of a younger individual, with limited education, able to communicate in English, and only unskilled past relevant work. This person could do the jobs described by the VE and was thus not disabled.

## IV. Discussion

### A. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

### B. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

The ALJ must follow the five-step sequential process prescribed by the Commissioner for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f); *Lester* at 828 n. 5. As described above, the ALJ followed that procedure in this case.

**C.     Plaintiff's Claims**

First, Plaintiff contends that the ALJ committed legal error in crediting a non-examining physician over Plaintiff's two treating physicians. Second, Plaintiff contends that the ALJ erred in finding that Plaintiff had no severe impairments.

Before analyzing the ALJ's analysis of the medical evidence, the Court notes that the ALJ's conclusion that Plaintiff lacked credibility was highly relevant, both to the ALJ's confidence in her testimony, as well as to the ALJ's confidence in her treating physicians whose opinions relied largely on Plaintiffs' self-described symptoms.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). *See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533

12

F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Medical treatment necessarily relies on the patient's account of his or her physical or mental condition, specific symptoms, effects of medications and other treatment, and such. As the ALJ concluded, the opinions of Plaintiff's physicians must be evaluated in light of Plaintiff's credibility. Nonetheless, Plaintiff's impaired credibility alone is insufficient to resolve the question of Plaintiff's residual functional capacity and ultimately, disability. The hearing decision must address all evidence of Plaintiff's medical condition and the ALJ's reasoning as carefully and completely as it addressed Plaintiff's credibility.

### 1. The ALJ Properly Credited Dr. Alpern's Opinion

The ALJ accepted that Plaintiff had medically determinable impairments (hypertension and right side weakness/numbness), but he did not credit her statements as to their alleged intensity, persistence or limiting effects. Plaintiff asks the court to give controlling weight to the opinions of her treating physicians, Drs. Nguyen and Thiagarajan, who submitted RFC

questionnaires that described Plaintiff's symptoms as highly limiting. As Plaintiff points, a treating physician's opinion may be entitled to "controlling weight" when it is not inconsistent with substantial evidence in the case record. SSR 96-2p. However, this rule is not applicable here: the treating physicians' opinions have in fact been contradicted, by the opinion of Dr. Alpern, a nontreating physician.

Because these experts reached contradictory conclusions, the ALJ had to resolve this conflict. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002). In general, greater weight is accorded to the opinion of a treating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen,* 812 F.2d 1226, 1230 (9th Cir.1987). However, the ALJ may credit the nontreating physician over the treating physician if the ALJ gives "specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). Where medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary. *Id.* at 600-01.

The records showed that Plaintiff saw Dr. Thiagarajan seven times. At Plaintiff's first appointment, Dr. Thiagarajan initially attributed her numbness to anxiety attacks. Over the course of subsequent treatment, Dr. Thiagarajan pursued further testing, including electromyography (EMG) and nerve conduction studies (NCS) to explain her alleged loss of sensation, a CT scan and MRIs, and a cerebrospinal fluid (CSF) analysis. Based on this testing, he was unable to identify the cause of Plaintiff's symptoms. His RFC questionnaire reflects "diagnoses" of paresthesias (loss of sensation) and syncope (fainting), but it does not describe the cause of these symptoms.

According to Dr. Alpern, there was insufficient information in the record to rule out many causes of Plaintiff's lateral paresthesia (including MS, which Dr. Thiagarajan improperly believed he had ruled out). Dr. Alpern described testing that would have helped rule out some of these causes, such as a full neurological study or a study of the vascular system. Dr. Ngyuen's RFC questionnaire went further than Dr. Thiagarajan's and included stroke as a diagnosis. However,

according to Dr. Alpern, the tests were inconsistent with stroke. Dr. Nguyen's diagnosis of stroke lacks support in the medical record, and instead reflects Plaintiff's self-described history of stroke.

Instead of basing their findings in diagnoses backed by medical evidence, both treating doctors based their assessments of Plaintiff's RFC largely on her own descriptions of her symptoms. Both doctors accepted Plaintiff's allegations regarding her paresthesia. Progress notes from Dr. Nguyen's clinic show that Plaintiff repeatedly complained of headaches, neck pain, or limb pain, usually localized to the right side. Beyond these complaints, however, Dr. Nguyen's clinic was unable to do much testing before referring Plaintiff to a neurologist. The neurologist, Dr. Thiagarajan, performed various tests, but his diagnoses (paresthesia and syncope) simply repeated Plaintiff's subjective complaints. His RFC identifies severe right-side limitations, but as Dr. Alpern pointed out, there was in fact no examination done to show how Plaintiff's numbness was localized. Likewise, both treating doctors credited Plaintiffs' description of a decrease in strength, but this opinion was not supported in the record by evidence of atrophy or loss of muscle strength. Both doctors' RFCs also limited Plaintiff from performing posturals, which was not supported in the record.

Because the treating physicians relied heavily on Plaintiff's complaints, the ALJ found that Plaintiff's own highly problematic credibility undermined the credibility of their RFC opinions. *See Morgan*, 169 F.3d at 602 ("A physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted'") (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir.1989)). First and importantly, Plaintiff's testimony to the ALJ contradicted statements about her medical history that she made to her treating physicians. These are serious contradictions, because they undermine both Plaintiff's credibility and the court's confidence in her treating doctors' conclusions. Plaintiff told her treating physicians that she had significant side effects from her medications, including dizziness and drowsiness. At the hearing, by contrast, Plaintiff told the ALJ that she had no side effects from her medications. Plaintiff also prevaricated about her history of substance abuse. She told Dr. Thiagarajan that she had used drugs for twenty years, but Plaintiff told the ALJ that she had used drugs for ten. And Dr. Thiagarajan believed that

15

Plaintiff "does not drink alcohol and never has," but other records describe her as a "former drinker." Plaintiff's recent substance abuse by itself also legitimately cast doubts on Plaintiff's credibility. This includes her acknowledgment that she had continued to use drugs at least through October 2008, which is after she left a recovery home for substance abuse in August 2008. Another issue with Plaintiff's credibility includes her poor work history. Also, the ALJ did not credit Plaintiff's description of her limited daily activities: her description of her limitations was not supportable by the medical evidence and could not be otherwise verified.

In short, the ALJ provided several specific, legitimate reasons that were based on substantial evidence in the record for favoring the opinion of Dr. Alpern over Plaintiff's treating physicians.

### 2. Substantial Evidence Showed Plaintiff Had No Severe Impairments

"The Step Two inquiry is a *de minimis* screening device to dispose of groundless or frivolous claims." *Salvatera v. Astrue*, 2012 WL 603205 at * 7 (E.D. Cal. February 23, 2012) (No. 1:10-cv-01464-SKO). *See also Bowen v. Yuckert*, 482 U.S. 137 (1987). At step two of the analysis, the claimant has the burden of producing medical evidence of signs, symptoms, and laboratory findings supporting the conclusion that his or her impairment is severe and can be expected to last more than twelve months. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005). An impairment is severe when it significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c).

The mere existence or diagnosis of an impairment is not sufficient to sustain a finding of disability. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993); *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990); *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985). Even if the claimant is diagnosed with a listed impairment, that impairment may not be qualify as a severe impairment if the impairment is not severe enough or if the claimant has not had it for a sufficient length of time. *Kennedy v. Sullivan*, 919 F.2d 144 (table), 1990 WL 177973 (9th Cir. November 15, 1990) (No. 88-15609). If the medical evidence indicates only a slight abnormality or combination of slight abnormalities that have no more than a minimal effect of the claimant's ability to work, the abnormality or combination of abnormalities is not a severe impairment. SSR

85-28. If a claimant's impairment is not severe, the ALJ must find the claimant not to be disabled at step 2. *Wafer v. Sullivan*, 1994 WL 141649 at *4 (N.D. Cal. April 13, 1994) (No. C-92-3763 EFL); 20 C.F.R. § 416.920(a)(4)(ii).

Plaintiff alleged inability to work due to three strokes, right side weakness, swelling in the right arm and a blood clot in her right jugular vein. The ALJ rejected the evidence of strokes, relying in part on the opinion of Dr. Alpern. As to Plaintiff's right-side issues, the ALJ accepted that she had this impairment but found that it was not severe (or, alternatively, that it was not significantly limiting). He based this conclusion on the concerns discussed above: he neither credited Plaintiff's own description of her symptoms nor that of her treating physicians, who largely repeated her subjective complaints.

Dr. Alpern reviewed the record and found that her paresthesia would only cause "some problems" in frequent, repetitive actions on her right side, which would be a limitation but not a complete limitation on her right side; she could use the upper right extremity for all functions, with limitations only on grasping, gripping, and posturals. In light of the problems with Plaintiff's testimony and the opinions of her treating doctors, the ALJ properly favored the opinion of Dr. Alpern.

**V.     Conclusion**

The ALJ's conclusions were supported by substantial credible evidence. Accordingly, this Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits. The Clerk of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security.

**IT IS SO ORDERED.**

Dated: 3/11/2013                                         /s/ SANDRA M. SNYDER
                                                         UNITED STATES MAGISTRATE JUDGE